**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, et al.,<br><br>　　　　　　　　　　　　　Debtors. | Case No. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |
| RESIDENTIAL FUNDING COMPANY, LLC, ,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>UBS REAL ESTATE SECURITIES, INC.,<br><br>　　　　　　　　　　　　　Defendant. | Adv. Case No. 14-01926-mg<br><br>**FIRST AMENDED**<br>**COMPLAINT** |

Plaintiff Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its First Amended Complaint against defendant UBS Real Estate Securities, Inc. ("UBS" or "Defendant"), as follows:

<u>**NATURE OF ACTION**</u>

1.　　　This case arises in substantial part from the billions of dollars in liabilities and losses incurred by Plaintiff RFC in and pursuant to its chapter 11 bankruptcy case.  Those liabilities and losses, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant UBS, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

2.　　　Plaintiff RFC was, at times prior to its bankruptcy filing in May 2012, in the business of acquiring and securitizing residential mortgage loans.

3.       RFC's business model was built on acquiring loans from "correspondent lenders," such as Defendant UBS, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.       Over the course of the parties' relationship, UBS sold over 1,900 mortgage loans, with an original principal balance in excess of $500 million, to RFC.

5.       Critical to RFC's business success was the quality of the loans it purchased.  To that end, RFC required its correspondent lenders, including UBS, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.       Over the course of RFC's business relationship with Defendant UBS, RFC identified loans that contained material defects violating one or more of UBS's contractual representations and warranties, and UBS in some cases acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent UBS repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, many defective loans sold to RFC by UBS remain unresolved.  Moreover, UBS's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to UBS's sale of defective loans to RFC.  The parties' Agreement entitles RFC to recovery of the additional liabilities and losses it incurred due to UBS's breaches.

7.    Ultimately, due in significant part to the failure of correspondent lenders, including UBS, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8.    By the time RFC and the other above-captioned debtors (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9.    During the bankruptcy proceeding, hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by UBS.

10.    Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims in its bankruptcy case.  This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors.  On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the chapter 11 plan.

11.    Defendant UBS is contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Defendant's representations and warranties.

12.    Accordingly, RFC brings this action for breach of contract, and for indemnification of all liabilities and losses RFC has incurred due to Defendant's breaches of its representations and warranties.

<u>**PARTIES**</u>

13.    Plaintiff RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC was formerly known as Residential Funding Corporation.  When this case was commenced, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et. al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"), on December 17, 2013, GMAC-RFC Holding Company, LLC's interest in RFC was cancelled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights and interests under RFC's Agreement with UBS, and now controls RFC.[1]

14.    Defendant UBS Real Estate Securities, Inc., is a Delaware corporation with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.

---

[1]    The Trust is organized pursuant to the Delaware Statutory Trust Act.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy proceedings. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(C) in that Defendant has filed proof of claim 4200 against Debtor RFC.  RFC hereby consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

16.     Venue is proper in the United States Bankruptcy Court for the Southern District of New York, because these claims relate to the bankruptcy of Plaintiff RFC and certain of its affiliates already pending in that court as Case No. 12-12020 (MG); the liquidation of these claims will impact the assets available to distribute to RFC's creditors under the Plan approved by the Bankruptcy Court; and litigating the case in the Bankruptcy Court is necessary to ensure the prompt administration of justice for all parties, including RFC's creditors.  Apart from the pendency of RFC's own bankruptcy, Defendant has also filed proofs of claim number 4200 against RFC and number 4453 against Debtor GMAC Mortgage, LLC.

## FACTUAL BACKGROUND

### The Agreement Between RFC and UBS

17.     Over the course of the parties' relationship, UBS sold over 1,900 mortgage loans to RFC pursuant to the Master Seller's Purchase and Warranties Agreement attached as Exhibit A (the "Agreement").

18.     Pursuant to the Agreement, UBS made a number of representations and warranties to RFC regarding, among other things, the quality of the mortgage loans it sold RFC;

the manner in which the mortgage loans were originated and underwritten; and the compliance of the mortgage loans with applicable state and federal law.

19.    A preliminary list of the loans sold by UBS to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit B.  The original principal balance of these loans exceeds $500 million.

20.    As a correspondent lender, UBS had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  UBS had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was UBS, or others from whom UBS purchased mortgages, that actually closed the loans with the borrowers.

21.    As UBS was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

22.    As UBS was also well aware, RFC from time to time sold pools of loans to whole loan investors.

23.    UBS knew of RFC's intention to securitize and/or sell the loans.  Specifically, Defendant UBS acknowledged, in Article IV of the Agreement, that the loans it sold RFC were subject to being sold to others through whole loan transfers or as public or private pass-through transfers, such as would occur in a mortgage-backed securitization.  Accordingly, Defendant agreed to provide RFC "for inclusion in any prospectus or other offering material such publicly available information regarding the Company and its underwriting guidelines and procedures,

and to indemnify [RFC] and its affiliates for material misstatements or omissions contained in such information …."  See Exhibit A at 4.01(b)(4).

24.     Pursuant to the Agreement, Defendant UBS made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

a.  "The information set forth in the related Mortgage Loan Schedule, as of the dates set forth therein, is complete, true and correct in all material respects." (Exhibit A at § 3.02(a).)

b.  "At origination of the Mortgage Loan, any and all requirements of any federal, state or local law, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan had been complied with in all material respects."  (Exhibit A at § 3.02(d).)

c.  "No fraud, misrepresentation or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Company, the Originator or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan."  (Exhibit A at § 3.02(f).)

d.  "Each Mortgage Loan was originated pursuant to the Underwriting Standards" incorporated into the Contract, "and the Mortgage Loan complies with all the terms, conditions and requirements of such Underwriting Standards." (Exhibit A at § 3.02(l).) UBS's Underwriting Standards, in turn, contained a detailed set of requirements governing appraisals, income documentation, debt-to-income ratios, loan-to-value ratios, and other pertinent requirements.

e.  "The Mortgage File contains an appraisal of the Mortgaged Property which was signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan…." (Exhibit A at § 3.02(p).)

f.  "No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%."  (Exhibit A at § 3.02(ii).)

g.  No Mortgage Loan was a "high cost" or "predatory" loan under applicable federal, state or local laws.  (Exhibit A at § 3.02(jj) & (oo).)

h.  All points, fees and charges were disclosed in writing to the borrower "in accordance with applicable state and federal law and regulation."  (Exhibit A at § 3.02(pp) & (qq).)

i.  "The representations and warranties of the Company contained in the related [Assignment, Assumption and Recognition Agreement] are true and correct in all material respects."  (Exhibit A at § 3.02(uu).)

25.    These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from UBS.  UBS's contractual warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors.  If any of UBS's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from UBS under which RFC would have recourse for its liabilities and losses on account of defective loans.

26.    Pursuant to the Agreement, UBS's failure to comply with its representations and warranties gave RFC the right to seek cure, repurchase, substitution, or payment on account of defective mortgage loans.  (See Exhibit A at § 3.03.)

27.    UBS also expressly agreed to broad indemnification provisions, which provide as follows:

> In addition to such [other remedies], [UBS] shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, fees (including reasonable legal fees), judgments, costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of [UBS's] representations and warranties…

(Exhibit A at § 3.03.)

28.    Additionally, prior to the commencement of this lawsuit, UBS conceded that certain of its loans sold to RFC were materially defective.  In that regard, UBS has already paid sums to RFC to cover those defects.  In this action, RFC is not seeking to recover again on those sums.

29.    RFC at all times performed all of its obligations to UBS, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**Defendant Materially Breached Numerous Loan-Level Representations and Warranties.**

30.    As noted above, the loans RFC acquired from UBS and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

31.    The loans UBS sold RFC were eventually deposited in over 50 RMBS Trusts. When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.  In making those representations and warranties, RFC relied on information provided to it by UBS and other correspondent lenders.  That information in many cases violated UBS's representations and warranties to RFC.

32.    UBS materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

33.    Over time, many of the loans sold to RFC by UBS defaulted or became seriously delinquent.  Many of the loans UBS sold RFC and RFC securitized eventually sustained losses, collectively totaling $45 million, exposing RFC to claims from investors, monoline insurers, and others.

34.    These delinquency and default rates far exceed what would normally be expected in a given population of mortgage loans.

35.     Internal reviews conducted by RFC determined that hundreds of the loans sold to RFC by UBS violated the Agreement and/or other representations or warranties made by UBS, resulting in a breach under the Agreement.

36.     The types of defects varied, but included income misrepresentation, employment misrepresentation, insufficient credit scores, owner occupancy misrepresentations, appraisal misrepresentations or inaccuracies, and missing or inaccurate documents, among others. Additional material defects are likely contained throughout the loan population sold to RFC by UBS.  Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

37.     By way of example, the following loans sold to RFC by UBS were identified as having significant and material defects violating the Agreement representations and warranties:

    a.    Loan ID # 9915053 (included in securitization 2005-QA10) - The borrowers on this loan misrepresented their income.  The loan application showed that the first borrower had stated income of $5,800/month working at a body shop, and the second borrower had stated income of $5,700/month working at Waste Management.  The borrowers filed for bankruptcy within a few years after this loan was funded, which confirmed that combined income at the time of origination was $4,189/month.  The revised income increased the debt-to-income ratio to 61%, which was unacceptable under the applicable program guidelines.  The high debt-to-income ratio indicated that the loan was materially riskier than represented as it meant the borrowers were likely to have trouble servicing the mortgage. RFC's internal quality review personnel determined that the loan materially breached representations and warranties made by UBS and was therefore deemed unacceptable under RFC standards.

    b.    Loan ID # 11182655 (included in whole loan purchase 2007-HWH2) - The borrower on this $54,000 second lien loan misrepresented her/his employment.  The borrower claimed that s/he owned a business, but upon confirmation, it was discovered that the business was owned by the non-borrowing spouse, and the business had been involuntarily dissolved prior to the date of the loan.  As a result, RFC's internal quality audit personnel were not able to verify the borrower's self-employment income.  This misrepresentation of income is a material breach of the representations and

warranties made by UBS, and the loan was therefore deemed unacceptable under RFC's standards.

    c. Loan ID # 11182585 (included in whole loan purchase 2007-HWH2) – The borrower on this loan made late payments on his/her mortgage during the 12 month period prior to the closing of the loan in question. Section 502.2 of UBS's own underwriting guidelines required documentation of 12 months of mortgage payments or rental payments on the property. It is commonly understood in the industry that a good payment history is a good indicator of whether a borrower will continue to timely make payments in the future. The late payment of the existing mortgage was a material breach of the applicable representations and warranties, which rendered the loan unacceptable to RFC.

38.    The above examples are not intended to be an exhaustive list of the loans sold by UBS to RFC that contained material breaches of representations and warranties. Rather, these loans represent a sampling of the material defects found in the loans UBS sold to RFC. Many more of the loans sold to RFC by UBS contained material defects that violated the representations and warranties UBS made in the Agreement. While UBS has, over the parties' course of dealing, repurchased some individual loans (thereby acknowledging it sold defective loans to RFC), it has in no way fully compensated RFC for the breaches of representations and warranties, liabilities, or losses stemming from the universe of defective loans UBS sold to RFC over time.

39.    As detailed below, these defects constituted material breaches of Defendant's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches.**

40.    As a direct result of Defendant UBS's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from UBS.

41.    First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by UBS.

42.    In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by UBS and others in extensive federal and state court litigation in which plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

43.    Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by UBS and others.

44.    For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by UBS included a number of RMBS that became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective in one or more ways.

45.    RFC ordinarily received a limited number of repurchase demands, primarily from whole loan investors.

46.    However, in early 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, began questioning the quality of large numbers of loans in the securitizations it had insured.

47.    MBIA hired a team to begin reviewing loan files, and in May 2008, based on the *less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC repurchase many allegedly defective loans.  A number of the loans subject to these repurchase requests were loans UBS sold to RFC and RFC pooled in the securitization trusts for which MBIA issued financial guaranty insurance policies.

48.     Although RFC aggressively defended the claims made by MBIA wherever possible, RFC ultimately acknowledged that, even on the basis of representations and warranties that were less stringent than those UBS made to RFC, RFC was obligated to repurchase at least 24% of the loans MBIA claimed were defective.  These loans included, by way of example only, the following loans sold to RFC by UBS:

> a. Loan ID # 11182815 (included in securitization 2007-HSA2):  The borrower on this $15,750.00 second lien loan had a debt-to-income ratio of 110%, which was well in excess of program guidelines and indicated the borrower was extremely unlikely to be able to service the loan. RFC's internal quality audit personnel agreed with MBIA's determination that the loan contained an unacceptable material breach of representations and warranties, and repurchased the loan from the securitization trust in September 2008 for approximately $18,670.24.

> b. Loan ID # 11182511 (included in securitization 2007-HSA2): MBIA alleged that the original value estimate for the property securing the second lien loan in question was not supported and that the UBS did not accurately determine if the property had sufficient value, which made the property a high risk. The failure to perform a sufficient appraisal constituted a material breach of UBS's own underwriting guidelines and breached its representations and warranties. Although RFC attempted to convince MBIA to withdraw this repurchase demand, MBIA did not do so, and filed suit against RFC instead.

> c. Loan ID # 11182877 (included in securitization 2007-HSA2): The loan file for this second lien loan was missing the HUD-1.  The failure to provide a complete loan file constituted a material breach of UBS's representations and warranties.  Although RFC eventually located the missing HUD-1 and attempted to convince MBIA to withdraw this repurchase demand, MBIA did not do so, and filed suit against RFC instead.

49.     MBIA continued its review and continued to find many defective loans, ultimately resulting in protracted and costly litigation, as described below.

50.     Other purchasers or investors in loans UBS sold to RFC and RFC sold to those purchasers or investors also identified defects in the UBS loans and demanded that RFC repurchase them.  These entities included Bank of America, E*Trade, and others.

51. Beginning in October 2008, RFC was sued in literally dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by UBS.

52. The first of these lawsuits was filed by bond insurer MBIA in October 2008. The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans. For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

53. The MBIA lawsuit specifically attacked RFC's RMBS offerings 2006-HSA4, 2006-HSA5, and 2007-HSA1, HSA2 and HSA3. Over 60 UBS loans (as shown on Exhibit C) were included in the 2007-HSA2 offering.

54. The MBIA lawsuit was followed shortly by a class action suit filed by the New Jersey Carpenters pension funds.

55. The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans. These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS." As shown in Exhibit C, dozens of UBS loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

56. The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint. (NJ Carpenters First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v. Residential Capital, LLC et al.* Case No. 08-cv-08781 (HB) (S.D.N.Y.).) Of course, that data

was provided to RFC—and represented and warranted to be accurate—by UBS and other correspondent lenders.

57.     Similarly, the Federal Housing Finance Authority, as conservator for Freddie Mac, filed suit against RFC in 2011, seeking to recover losses stemming from loan defects in RMBS offerings that contained hundreds of UBS loans, including RAMP offerings 2005-RS9 and 2006-RS1.

58.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

59.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

60.     Collectively, these lawsuits involved more than one hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

61.     Across the dozens of securitizations involved in these lawsuits, UBS was responsible for over 1,000 of the loans.

62.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by UBS.

63.     In May 2012, RFC and certain of its affiliates—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

64.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation.  These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by UBS.

65.     By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

a.   The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by UBS and securitized) were responsible for more than $19.5 billion in repurchase obligations.

b.   AIG, an investor in over 25 Debtor-sponsored securitizations (a number of which included UBS loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

c.   Allstate, an investor in 25 Debtor-sponsored securitizations (a number of which included UBS loans), filed 20 proofs of claim based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

d.   John Hancock, an investor in over 50 Debtor-sponsored securitizations (a number of which included UBS loans), filed 43 proofs of claim asserting similar allegations.

    e.   MBIA, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included UBS loans, filed six proofs of claim seeking approximately $2.2 billion in damages based on alleged defects contained in the loans, a number of which (as described above) MBIA had individually reviewed.

    f.   FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included UBS loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had individually reviewed.

66.    Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

67.    These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from UBS, and on which RFC had relied.

68.    One of the entities that filed a proof of claim against RFC was UBS itself. In proof of claim number 4200, dated November 6, 2012, it asserted, among other things, an unliquidated claim for breaches of representations and warranties on loans it had purchased from RFC. UBS has characterized its proof of claim as relating to UBS's purchase of "mortgage loans from [RFC]" pursuant to certain Purchase Agreements; UBS's subsequent sponsoring of RMBS offerings "backed by these loans"; and UBS's purportedly resulting liabilities and losses, including alleged liabilities and losses in litigation filed against UBS "based upon alleged breaches of representations and warranties related to [the] loans" UBS purchased from RFC. (Response of UBS Real Estate Securities Inc. to Debtors' Fifty-Second Omnibus Objection To Claims, Feb. 13, 2014, at ¶¶ 1-2, *In re Residential Capital LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) (Docket No. 6470). Based on these assertions, UBS in the proof of claim is

17

seeking to recover from RFC on theories including indemnification and breach of contract.  The Debtors have objected to the proof of claim (*see* docket no. 6074), and their objection is unresolved.

69.     The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy case.  Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases.  A lengthy mediation process ensued, which, together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of all of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, FHFA, securities law claimants, and others.

70.     The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement, including the $10 billion-plus settlement of RMBS-related liabilities, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the plan.  (See Case No. 12-12020-mg, Doc. 6066 (Findings of Fact) (Glenn, J.), at ¶¶ 98 to 176.)  RFC filed this suit on December 17, 2013, after RFC's RMBS-related liabilities became fixed through confirmation of the Plan.  The Plan became effective on December 17, 2013.  Pursuant to the Plan, the Trust succeeded to all of RFC's rights and interests, including its litigation claims against UBS.

71.     Pursuant to its express contractual obligations, UBS is obligated to compensate RFC for the portion of global settlement associated with its breaches of representations and

warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

## COUNT ONE
## (BREACH OF CONTRACT)

72.    RFC realleges each and every allegation set forth in Paragraphs 1 through 69, above, as if fully rewritten herein.

73.    RFC and Defendant UBS entered into a valid and enforceable Agreement pursuant to which RFC acquired over 1,900 mortgage loans from UBS.

74.    Pursuant to the parties' Agreement, UBS made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

75.    RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

76.    Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

77.    RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Defendant, and fees and costs incurred in prosecuting this action.

78.    Accordingly, RFC is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION)

79.    RFC realleges each and every allegation set forth in Paragraphs 1 through 76, above, as if fully rewritten herein.

80.    RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans UBS sold to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by UBS.

81.    Defendant expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC has incurred.

82.    Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)    On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)    On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify RFC against liabilities, losses, expenses and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for damages sufficient to reimburse RFC's liabilities, losses, costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

20

(C)    All such further relief, as the Court deems necessary or proper.

Dated:  April 14, 2014

By
Peter E. Calamari
Isaac Nesser
Alex Rossmiller
John Sullivan
Nicholas Smith
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
PeterCalamari@quinnemanuel.com
IsaacNesser@quinnemanuel.com
AlexRossmiller@quinnemanuel.com
JohnSullivan@quinnemanuel.com
NicholasSmith@quinnemanuel.com


COUNSEL TO RESIDENTIAL FUNDING
COMPANY, LLC