**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, et al.,<br><br>          Debtors. | Case No. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |
| RESIDENTIAL FUNDING COMPANY, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>UBS REAL ESTATE SECURITIES, INC.,<br><br>          Defendant. | Adv. Case No. 14-01926-mg<br><br>**SECOND AMENDED**<br>**COMPLAINT** |

Plaintiff ResCap Liquidating Trust (the "Trust" or "Plaintiff"), as successor to Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC"), by and through its attorneys, alleges for its Second Amended Complaint against Defendant UBS Real Estate Securities, Inc. ("UBS" or "Defendant"), as follows:

## NATURE OF ACTION

1.     This case arises in substantial part from the billions of dollars in liabilities and losses incurred by RFC as one of the Debtors in the above-captioned chapter 11 cases. Those liabilities and losses, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant UBS, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

2.     Plaintiff RFC was, at times prior to its bankruptcy filing in May 2012, in the business of acquiring and securitizing residential mortgage loans.

3.      RFC's business model was built on acquiring loans from "correspondent lenders," such as Defendant UBS, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.      Over the course of the parties' relationship, UBS sold over 2,200 mortgage loans, with an original principal balance in excess of $685 million, to RFC.

5.      Critical to RFC's business success was the quality of the loans it purchased.  To that end, RFC required its correspondent lenders, including UBS, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.      Over the course of RFC's business relationship with Defendant UBS, RFC identified loans that contained material defects violating one or more of UBS's contractual representations and warranties, and UBS in some cases acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent UBS repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, many defective loans sold to RFC by UBS remain unrecompensed.  Moreover, UBS's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to UBS's sale of defective loans to RFC.  The written agreement of the parties entitles RFC to recovery of the additional liabilities and losses it incurred due to UBS's breaches.

7.      Ultimately, due in significant part to the failure of correspondent lenders, including UBS, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8.      By the time RFC and the other above-captioned Debtors filed their above-captioned bankruptcy cases in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9.      During these cases, hundreds of proofs of claim were filed against RFC by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by UBS.

10.     On November 10, 2012, Defendant UBS filed proof of claim number 4200 against RFC, asserting an unliquidated claim for breaches of representations and warranties on loans it purchased from RFC, based on alleged repurchase and indemnification obligations and arising in part from RMBS litigations brought against UBS.  The Debtors objected to this proof of claim as part of the *Debtors' Fifty-Second Omnibus Objection to Claims (Insufficient Documentation)*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 12, 2013) [D.I. 6074], without prejudice to objecting on any additional basis.  Defendant UBS then filed the *Response of UBS Real Estate Securities Inc. to Debtors' Fifty-Second Omnibus Objection to Claims (Insufficient*

3

*Documentation*), Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Feb. 13, 2013) [D.I. 6470].  UBS's proof of claim number 4200 and Debtors' objection thereto remain pending and unresolved. Plaintiff now brings this action as a counterclaim to Defendant UBS's proof of claim number 4200.

11.    Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims in its bankruptcy case.  This agreed resolution of RFC's RMBS-related liabilities was set forth in a Global Settlement, which was the cornerstone of the liquidating chapter 11 plan for RFC and its affiliated Debtors.  On December 11, 2013, after a five-day confirmation trial, this Court approved the Global Settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan").  Under paragraphs 24 and 48 of the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [D.I. 6065], and Article IV of the Plan, the Trust is responsible for monetizing many of the Debtors' remaining assets, including pursuing litigation claims—such as this one—arising from RFC's rights against UBS and other parties who sold mortgages to RFC, and distributing the proceeds to the Debtors' creditors.

12.    Defendant UBS is contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Defendant's representations and warranties.

13.    Accordingly, the Trust brings this action for breach of contract and for indemnification of all liabilities and losses RFC has incurred due to Defendant's breaches of its representations and warranties.

## PARTIES

14.    Plaintiff ResCap Liquidating Trust is a Delaware Statutory Trust. When the above-captioned bankruptcy cases were commenced, RFC was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. RFC was formerly known as Residential Funding Corporation. At that time, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company. GMAC-RFC Holding Company, LLC, was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company. Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group, LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the Plan, on its Effective Date of December 17, 2013, GMAC-RFC Holding Company's interest in RFC was cancelled and the Trust succeeded to all of RFC's rights and interests under RFC's written agreement with UBS.

15.    Defendant UBS Real Estate Securities, Inc., is a Delaware corporation with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy cases or proceedings. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(C) in that it is a counterclaim to Defendant UBS's proof of claim number 4200 against Debtor RFC,

and under § 157(b)(2)(A), (L), and (O) in that it affects the administration of the Debtors' bankruptcy cases, requires the enforcement of the Plan, and impacts the liquidation of the assets of the estate. RFC hereby consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution. This Court also has jurisdiction under 28 U.S.C. § 1367, in that this matter is part of the same case or controversy as Defendant UBS's proof of claim number 4200.

17.     Venue is proper in the United States Bankruptcy Court for the Southern District of New York because these claims relate to the bankruptcy cases of Plaintiff RFC and certain of its affiliates already pending in that court as Case No. 12-12020 (MG); the liquidation of these claims will determine the assets available to distribute to RFC's creditors under the Plan confirmed by the Bankruptcy Court; and litigating the case in the Bankruptcy Court is necessary to ensure the prompt administration of justice for all parties, including RFC's creditors. Venue is also proper in this court because Defendant has also filed proofs of claim number 4200 against Debtor RFC and number 4453 against Debtor GMAC Mortgage, LLC.

## FACTUAL BACKGROUND

### The Agreement Between RFC and UBS

18.     Over the course of the parties' relationship, UBS sold over 2,200 mortgage loans to RFC pursuant to the Master Seller's Purchase and Warranties Agreement attached hereto as Exhibit A (the "Agreement").

19.     Pursuant to the Agreement, UBS made a number of representations and warranties to RFC regarding, among other things, the quality of the mortgage loans it sold RFC;

the manner in which the mortgage loans were originated and underwritten; and the compliance of the mortgage loans with applicable state and federal law.

20.     Lists of loans sold by UBS to RFC pursuant to the Agreement, and subsequently securitized by RFC; as well as loans which were not securitized but instead held by RFC or sold in whole-loan sales, are attached hereto as Exhibits B-1 and B-2, respectively.  The collective original principal balance of these loans exceeds $685 million.

21.     As a correspondent lender, UBS had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  UBS had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was UBS, or others from whom UBS purchased mortgages, that actually closed the loans with the borrowers. Accordingly, UBS knew or should have known of the defects in the loans it sold to RFC.  UBS has a continuing obligation under § 3.03 of the Agreement to promptly notify RFC of any defects that it discovers in the loans.  UBS has continually breached this obligation, including through to the present, by failing to inform RFC of the loan defects.

22.     As UBS was well aware, once the loans were sold to RFC, RFC in many instances pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

23.     As UBS was also well aware, RFC from time to time sold pools of loans to whole-loan investors.

24.     UBS knew of RFC's intention to securitize and/or sell the loans.  Specifically, Defendant UBS acknowledged in Article IV of the Agreement that the loans it sold RFC were

subject to being sold to others through whole-loan transfers or as public or private pass-through transfers, such as would occur in a mortgage-backed securitization. Accordingly, "for inclusion in any prospectus or other offering material," Defendant agreed to provide RFC "publicly available information regarding [Defendant] and its underwriting guidelines and procedures, and to indemnify [RFC] and its affiliates for material misstatements or omissions contained in such information …." Ex. A § 4.01(b)(4).

25. Pursuant to the Agreement, Defendant UBS made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

    a. "The information set forth in the related Mortgage Loan Schedule, as of the dates set forth therein, is complete, true and correct in all material respects." Ex. A § 3.02(a).

    b. "At origination of the Mortgage Loan, any and all requirements of any federal, state or local law, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan had been complied with in all material respects." Ex. A § 3.02(d).

    c. "No fraud, misrepresentation or similar occurrence with respect to a Mortgage Loan has taken place on the part of [Defendant], the Originator or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan." Ex. A § 3.02(f).

    d. "Each Mortgage Loan was originated pursuant to the Underwriting Standards" incorporated into the Contract, "and the Mortgage Loan complies with all the terms, conditions and requirements of such Underwriting Standards." Ex. A § 3.02(l). The Underwriting Standards, in turn, contained a detailed set of requirements governing appraisals, income documentation, debt-to-income ratios, loan-to-value ratios, and other pertinent requirements.

    e. "The Mortgage File contains an appraisal of the Mortgaged Property which was signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan . . . ." Ex. A § 3.02(p).

     f.   "No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%." Ex. A § 3.02(ii).

     g.   No Mortgage Loan was a "high cost" or "predatory" loan under applicable federal, state or local laws. Ex. A § 3.02(jj) & (oo).

     h.   All points, fees and charges were disclosed in writing to the borrower "in accordance with applicable state and federal law and regulation." Ex. A § 3.02(pp) & (qq).

     i.   "The representations and warranties of the Company contained in the related [Assignment, Assumption and Recognition Agreement] are true and correct in all material respects." Ex. A § 3.02(uu).

26.     These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from UBS. UBS's contractual warranty of the quality of the loans was important because—as UBS was well aware—RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors. If any of UBS's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from UBS under which RFC would have recourse for these potential liabilities and losses on account of UBS's defective loans.

27.     Pursuant to the Agreement, UBS's failure to comply with its representations and warranties gave RFC the right to seek cure, repurchase, substitution, or payment on account of defective mortgage loans. See Ex. A § 3.03.

28.     UBS also expressly agreed to broad indemnification provisions:

In addition to such [other remedies], [UBS] shall indemnify [RFC] and hold it harmless against any losses, damages, penalties, fines, forfeitures, fees (including reasonable legal fees), judgments, costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of [UBS's] representations and warranties . . . .

Ex. A § 3.03.

29.     Additionally, prior to the commencement of this lawsuit, UBS conceded that certain of its loans sold to RFC were materially defective.  In that regard, UBS has already paid sums to RFC to cover those defects.  As stated in ¶ 6 above, RFC is not seeking to recover again on those sums.

30.     RFC at all times performed all of its obligations to UBS, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**Defendant Materially Breached Numerous Loan-Level Representations and Warranties.**

31.     As noted above, the loans RFC acquired from UBS and other correspondent lenders were sold either into RMBS trusts that issued certificates to outside investors or in "whole-loan" portfolios to other mortgage companies and banks.

32.     Some of the loans UBS sold RFC were eventually deposited in over 50 RMBS Trusts.  When RFC sold the loans, it passed on a similar but more limited set of representations and warranties to the Trusts and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.  In making those representations and warranties, RFC relied on information provided to it by UBS and other correspondent lenders.  That information in many cases breached UBS's representations and warranties to RFC.

33.     The Trust undertook an investigation to examine UBS's representations and warranties about the subject properties' appraised values and owner-occupancy status using an automated-valuation model ("AVM") and borrowers' tax records (together, the "Forensic Review").

34.     AVM is a tool in the mortgage industry that considers objective criteria such as the sale prices of comparable properties, previous surveyor valuations, historical house price movements, and user inputs (number of bedrooms, property improvements, etc.) in the same

locale as the subject property to determine the true market value of the property in question at a specific point in time.

35.     Using the same comparable sales data that would have been available to UBS at the time of origination, the AVM review first conducted retroactive appraisals of the properties backing the loans Defendant sold to RFC that were subsequently securitized.  The AVM review centered on three of UBS's core appraisal representations: (i) the information set forth in the related Mortgage Loan Schedule, as of the dates set forth therein, is complete, true and correct in all material respects (Ex. A § 3.02(a)); (ii) no fraud, misrepresentation or similar occurrence with respect to a Mortgage Loan has taken place on the part of UBS, the Originator, the Mortgagor or any other party involved in the origination of the Mortgage Loan (Ex. A § 3.02(f)); and (iii) no Mortgage Loan has a Loan-to-Value Ratio at the time of origination of more than 100% (Ex. A § 3.02(ii)).

36.     Among other findings, the AVM review concluded that, for loans where sufficient comparison data were available:

- 48% had reported property values overrepresented by more than 10%;

- 39% had reported property values overrepresented by more than 15%;

- 41% had reported loan-to-value ("LTV")[1] ratios underrepresented by more than 10%;

- 31% had reported LTV ratios underrepresented by more than 15%;

---

[1] The LTV ratio is a key measure of a borrower's likelihood to default.  The LTV ratio expresses the amount of the mortgage loan as a percentage of the total appraised value of the property.  For example, if a borrower borrows $80,000 to buy a house worth $100,000, then the LTV ratio is $80,000/$100,000, or 80%—the remaining $20,000 of the house's value reflect the borrower's 20% equity stake in the house.  A combined loan-to-value ratio (or "CLTV" ratio) expresses the amount of all of the loans secured by a property as a percentage of that property's appraised value; that is, it accounts for any additional liens.  The AVM review therefore used CLTV in analyzing second-lien loans.  A borrower with a sizable equity stake in a property has more to lose than a borrower with a small stake; thus, a borrower with a large equity position has financial incentives not to default and lose his or her equity.  Conversely, a borrower with little or no equity stake in a property has little financial incentive to avoid default.

- 18% had reported LTV ratios underrepresented by more than 25%; and

- 24% of the loans had actual LTV ratios greater than 100% (*i.e.*, the loans were "underwater" at origination).

A schedule identifying the loans in the AVM review and the findings connected with these loans is attached hereto as Exhibit C.

37.    All of these findings establish breaches of the representations in § 3.02(a) of the Agreement that all information provided on the loan schedule was true and correct and in § 3.02(f) that no fraud, misrepresentation, or similar occurrence had taken place with respect to a mortgage loan.  The last finding also establishes breaches of the representation in § 3.02(ii) that no loan had an LTV ratio in excess of 100%.  The AVM review demonstrates that defects are pervasive throughout the pool of loans UBS sold to RFC.

38.    The Forensic Review also investigated UBS's representations as to the owner-occupancy status of the loans UBS sold to RFC.  A property is said to be "owner-occupied" when the borrower has made the property her primary residence, as opposed to a vacation home or investment property.  When a property is not in fact owner-occupied, the borrower is more likely to default, which in turn increases the riskiness of the mortgage loan.  Borrowers who live in mortgaged properties are known to be less likely to "walk away" from those properties and default on their mortgage obligations than borrowers who buy residential properties as investments or as vacation homes.

39.    The owner-occupancy review centered on Defendant's representations that: (a) the information set forth in the related Mortgage Loan Schedule is true and correct in all material respects (Ex. A § 3.02(a)); (b) no fraud, misrepresentation, or similar occurrence had taken place on the part of UBS, the Originator, the Mortgagor, or any other party involved in the

origination of the Mortgage loan (Ex. A § 3.02(f)); and (c) there is no default, breach, violation or event of acceleration existing under a mortgage note (Ex. A § 3.02(i)).

40.     The owner-occupancy review ran two tests to determine the accuracy of Defendant's representations as to the owner-occupancy of the properties collateralizing the loans sold to RFC. The first test investigated where the borrower had her tax bills sent.  It is reasonable to expect that a borrower residing at a property would have her tax bills sent to that address.  If a borrower had her tax records sent to another address, the owner occupancy review regarded that as evidence that the borrower did not actually reside at the mortgaged property.  The second test assessed whether the borrower made certain tax exemptions based on the property.  If a borrower declined to make these tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere.  If a loan failed both of these tests, the owner-occupancy review identified a breach of the representations in §§ 3.02(a), (f), and (i), which provide that the information set forth in the related mortgage loan schedule is true and correct in all material respects, that no fraud or misrepresentation occurred on the part of UBS, the Originator, the Mortgagor or any other party involved in the origination of the Mortgage Loan, and that there was no default, breach, violation or event of acceleration existing under any mortgage note.  Of the analyzed loans, 8% failed the owner-occupancy tests and therefore breached the representations in §§ 3.02(a), (f), and (i) of the Agreement.

41.     In total, the Forensic Review indicated that 52% of the analyzed loans contained at least one breach.  Because a reunderwriting analysis considers a host of loan-level collateral characteristics that are not analyzed by an AVM review, reunderwriting is expected to show an even higher percentage of defects throughout the pool of loans that UBS sold to RFC.

42.    UBS materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

43.    Over time, many of the loans sold to RFC by UBS defaulted or became seriously delinquent.  Many of the loans UBS sold RFC that RFC securitized eventually sustained losses, collectively totaling in excess of $45 million, exposing RFC to claims from investors, monoline insurers, and others.

44.    These delinquency and default rates far exceed what normally would be expected in a given population of mortgage loans.

45.    As part of its ordinary business practices, RFC would review defaulted loans for possible breaches of representation and warranty.  These reviews conducted by RFC determined that hundreds of the loans sold to RFC by UBS violated the Agreement and/or other representations or warranties made by UBS, resulting in breaches under the Agreement.

46.    The types of defects varied, but included income misrepresentation, employment misrepresentation, insufficient credit scores, owner-occupancy misrepresentations, appraisal misrepresentations or inaccuracies, and missing or inaccurate documents, among others.  As explained above, additional material defects are likely contained throughout the loan population sold to RFC by UBS.  Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

47.    By way of further example, the following loans sold to RFC by UBS were identified as having significant and material defects violating the Agreement's representations and warranties:

    a.  Loan ID # 9915053 in the amount of $220,500 with a funding date of May 17, 2005 (included in securitization 2005-QA10) - The borrowers on this loan misrepresented their income.  The loan application showed that the first borrower had stated income of $5,800/month working at a body shop, and the second borrower had stated income of $5,700/month working at Waste Management.  The borrowers filed for bankruptcy within a few years after this loan was funded, which confirmed that their combined income at the time of origination was $4,189/month.  The revised income increased the debt-to-income ratio to 61%, which was unacceptable under the applicable program guidelines.  The high debt-to-income ratio indicated that the loan was materially riskier than represented as it meant the borrowers were likely to have trouble servicing the mortgage.  This loan breached at least the representations in §§ 3.02(a), (f), and (i) of the Agreement, which provide that the information set forth in the related mortgage loan schedule is true and correct in all material respects, and that no fraud or misrepresentation occurred on the part of UBS, the Originator, the Mortgagor or any other party involved in the origination of the loan.

    b.  Loan ID # 11182655 in the amount of $54,000 with a funding date of December 28, 2006 (included in whole-loan purchase 2007-HWH2) - The borrower on this $54,000 second-lien loan misrepresented her/his employment.  The borrower claimed that s/he owned a business, but upon confirmation, it was discovered that the business was owned by the non-borrowing spouse, and the business had been involuntarily dissolved prior to the date of the loan.  As a result, RFC's internal quality audit personnel were not able to verify the borrower's self-employment income.  This misrepresentation of income is a material breach of at least §§ 3.02(f) and (i) of the Agreement, which provide that there was no fraud or misrepresentation occurred on the part of UBS, the Originator, the Mortgagor or any other party involved in the origination of the loan.

    c.  Loan ID # 11182585 in the amount of $145,000 with a funding date of December 28, 2006 (included in whole-loan purchase 2007-HWH2) – The borrower on this loan made late payments on his/her mortgage during the 12-month period prior to the closing of the loan in question.  Section 502.2 of the Underwriting Guidelines required documentation of 12 months of mortgage payments or rental payments on the property.  It is commonly understood in the industry that a good payment history is a good indicator of whether a borrower will continue to timely make payments in the future.  The late payment of the existing mortgage was a material breach of UBS's

representation in § 3.02(l) of the Agreement that each mortgage loan complied with the Underwriting Guidelines.

 d. Loan ID # 10066755:  Among other breaches, the loan was represented as based on an owner-occupied property.  However, upon further investigation: (1) the Data Verify Borrower Profile Report from July 2014 reflects that the borrower resided at an undisclosed property in West Palm Beach, FL, from August 2005 through June 2014; (2) the tax assessor's records on Accurint indicate the borrower's address as the previous address listed on the application; (3) the Borrower renewed a driver's license in April 2005 and did not subsequently change the driver's license to reflect the new property address; (4) the Data Verify Real Estate Owned and MERS report shows the borrower purchased 3 properties all in rapid succession, which is an indication the borrower was acquiring real estate for investment purposes; and finally (5) the first payment letter in the loan file reflects the borrower's address on the application as the address to which the borrower's monthly mortgage statements were to be mailed.  Additionally, the borrower misrepresented the debt obligations listed on the loan application.  In fact, the borrower purchased two other properties just two months before purchasing the subject property, which were not listed on the mortgage application.  Both of these properties raised the borrower's monthly liability by $2,308.00, and subsequently raised the borrower's debt-to-income ratio to 67.18%, which exceeds the applicable allowable maximum of 50.00%.  Finally, because the subject loan did not pertain to an owner-occupied property, the subject loan was improperly approved under the 80/20 program.  These defaults breach the applicable Underwriting Guidelines, including without limitation § 3.02 of the Agreement.  The loan defaulted.

These examples further illustrate that defects were widespread and pervasive in the loan sold by Defendant to RFC.

 48. On the basis of the foregoing, Plaintiff has determined that at least the following loans contain defects and were sold in violation of the Agreement:  (a) the indicated loans listed on Exhibit C; (b) the loans listed in ¶ 47 above; and (d) the loans listed in ¶ 59 below.  Plaintiff hereby declares an event of default under the Agreement based on those breaches.

 49. The above-listed examples are not intended to be an exhaustive list of the loans sold by UBS to RFC that contained material breaches of representations and warranties.  Rather, these loans represent a sampling of the material defects found throughout the loans UBS sold to RFC.  Many more of the loans sold to RFC by UBS contained material defects that violated the

representations and warranties UBS made in the Agreement.  While UBS has, over the parties' course of dealing, repurchased some individual loans (thereby acknowledging it sold defective loans to RFC), it has in no way fully compensated RFC for the breaches of representations and warranties, liabilities, or losses stemming from the universe of defective loans UBS sold to RFC over time.

50.     As detailed below, these defects constituted material breaches of Defendant's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches.**

51.     As a direct result of Defendant UBS's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from UBS.

52.     First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by UBS.

53.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by UBS and others in extensive federal and state court litigation in which plaintiffs claimed the loans were rife with borrower or originator fraud or failed to comply with applicable state and/or federal law.

54.     Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by UBS and others.

55.     For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by UBS included a number of RMBS that became the subject of more than a dozen lawsuits

brought by investors and other participants in the securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective in one or more ways.

56.   RFC ordinarily received a limited number of repurchase demands, primarily from whole-loan investors.

57.   However, in early 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, began questioning the quality of large numbers of loans in the securitizations it had insured.

58.   MBIA hired a team to begin reviewing loan files, and in May 2008, based on the *less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC repurchase many allegedly defective loans.   A number of the loans subject to these repurchase requests were loans UBS sold to RFC that RFC then pooled in the securitization trusts for which MBIA issued financial guaranty insurance policies.

59.   Although RFC aggressively defended the claims made by MBIA wherever possible, RFC ultimately acknowledged that, even on the basis of representations and warranties that were less stringent than those UBS made to RFC, RFC was obligated to repurchase at least 24% of the loans MBIA claimed were defective.   These loans included, by way of example only, the following loans sold to RFC by UBS:

> a.   Loan ID # 11182815 in the amount of $15,750 with a funding date of December 28, 2006 (included in securitization 2007-HSA2) - The borrower on this second-lien loan had a debt-to-income ratio of 110%, which was well in excess of the Underwriting Guidelines and indicated that the borrower was extremely unlikely to be able to service the loan.   This breached the representation in § 3.02(l) of the Agreement that each mortgage loan complied with the Underwriting Guidelines.   RFC's internal quality audit personnel agreed with MBIA's determination that the loan contained an unacceptable material breach of representations and warranties, and repurchased the loan from the securitization trust in September 2008 for approximately $18,670.24.

    b.  Loan ID # 11182511 in the amount of $54,300 with a funding date of December 28, 2006 (included in securitization 2007-HSA2) - MBIA alleged that the original value estimate for the property securing this second-lien loan was not supported and that the UBS had not accurately determined whether the property had sufficient value, which made the loan a high risk. The failure to perform a sufficient appraisal breached the Underwriting Guidelines. This in turn breached the representation in § 3.02(l) of the Agreement that each mortgage loan complied with the Underwriting Guidelines. Although RFC attempted to convince MBIA to withdraw this repurchase demand, MBIA did not do so, and filed suit against RFC instead.

    c.  Loan ID # 11182877 in the amount of $43,500 with a funding date of December 28, 2006 (included in securitization 2007-HSA2) - The loan file for this second-lien loan was missing the "HUD-1." Although RFC eventually located the missing HUD-1 and attempted to convince MBIA to withdraw this repurchase demand, MBIA did not do so, and filed suit against RFC instead.

60.    MBIA continued its review and continued to find many defective loans, ultimately resulting in protracted and costly litigation, as described below.

61.    Other purchasers or investors in loans UBS sold to RFC that RFC then sold to those purchasers or investors also identified defects in the UBS loans and demanded that RFC repurchase them. These entities included Bank of America, E*Trade, and others.

62.    Beginning in October 2008, RFC was sued in dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by UBS.

63.    The first of these lawsuits was filed by bond insurer MBIA, in October 2008. The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans. For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

64.    The MBIA lawsuit specifically attacked RFC's RMBS offerings 2006-HSA4, 2006-HSA5, and 2007-HSA1, HSA2 and HSA3. Over 60 UBS loans (as shown on Exhibit B-1) were included in the 2007-HSA2 offering.

65.     The MBIA lawsuit was promptly followed by a class action suit led by the New Jersey Carpenters pension funds.

66.     The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  As shown in Exhibit B-1, dozens of UBS loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

67.     The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure, or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint.  First Am. Compl. ¶¶ 9, 110, *N.J. Carpenters v. Residential Capital, LLC*, No. 08-cv-8781 (S.D.N.Y.).  Of course, that data was provided to RFC—and represented and warranted to be accurate—by UBS and other correspondent lenders.

68.     Similarly, the Federal Housing Finance Authority, as conservator for Freddie Mac, filed suit against RFC in 2011, seeking to recover losses stemming from loan defects in RMBS offerings that contained hundreds of UBS loans, including RAMP offerings 2005-RS9 and 2006-RS1.

69.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in RFC's RMBS, and more than a dozen lawsuits brought by monoline insurers.

70.    All of these lawsuits alleged that the loans RFC sold into RMBS were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

71.    Collectively, these lawsuits involved more than 100 RMBS and a combined original principal balance of more than $100 billion.

72.    Across the dozens of securitizations involved in these lawsuits, UBS was responsible for over 1,000 of the loans.

73.    As of May 2012, RFC had already repurchased millions of dollars' worth of defective loans from its RMBS and from whole-loan purchasers, either at the request of a bond insurer or trustee or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by UBS.

74.    In May 2012, RFC and certain of its affiliates—due in part to their enormous potential exposure stemming from the pending mortgage-related lawsuits described above—filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

75.    Hundreds of proofs of claim were filed in the bankruptcy cases by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation.  These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by

21

UBS. By way of example, the following represents a small sampling of the hundreds of proofs

of claim filed on the basis of defective loans:

a. The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by UBS and securitized) were responsible for more than $19.5 billion in repurchase obligations.

b. AIG, an investor in over 25 Debtor-sponsored securitizations (a number of which included UBS loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of individual loan-level data for these loans.

c. Allstate, an investor in 25 Debtor-sponsored securitizations (a number of which included UBS loans), filed 20 proofs of claim based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of individual loan-level data for these loans.

d. John Hancock, an investor in over 50 Debtor-sponsored securitizations (a number of which included UBS loans), filed 43 proofs of claim asserting similar allegations.

e. MBIA, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included UBS loans, filed six proofs of claim seeking approximately $2.2 billion in damages based on alleged defects contained in the loans, a number of which (as described above) MBIA had reviewed individually.

f. FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included UBS loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had reviewed individually.

76.    Many whole-loan purchasers also filed proofs of claim in the bankruptcy cases,

collectively seeking millions of dollars in recovery.

77.    These proofs of claim, lawsuits, and demands all alleged, among other things, that

the securitized or purchased loans were defective, improperly underwritten, and breached

representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from UBS, and upon which RFC had relied. In many instances, creditors asserted claims against both RFC and other Debtors based on the same losses.

78. The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy case. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator to attempt a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which, together with related proceedings, resulted in a Global Settlement that, among other things, provided for the resolution of all of the Debtors' RMBS-related liabilities in exchange for over $10 billion in allowed claims, allocated by various means to the RMBS trusts, monoline insurers, FHFA, securities law claimants, and others. The manner in which multi-debtor claims were settled varied: For example, Article IV.C.3 of the Plan, together with Schedules 2-R and 3-R thereto, allowed the RMBS Trustees' claims and allocated them on an RMBS-by RMBS basis; Article IV.D of the Plan allowed the monoline insurers' claims, but on a basis and in a manner different from the RMBS Trustees' claims, and the largest securities claims were resolved through a separate settlement trust or a single cash payment. Each of these settlements involved claims asserted against RFC based on defective loans sold to it by UBS and other correspondents.

79.     The Bankruptcy Court for the Southern District of New York ultimately approved the Global Settlement, including the $10 billion-plus settlement of RMBS-related liabilities, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Plan.  See Findings of Fact ¶¶ 98-176, *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6066].  RFC filed this suit on December 17, 2013, after RFC's RMBS-related liabilities became fixed through confirmation of the Plan.  The Plan then became effective on December 17, 2013.  Pursuant to the Plan, the Trust at that time succeeded to all of RFC's rights and interests, including its litigation claims against UBS.

80.     Pursuant to its express contractual obligations, UBS is obligated to compensate RFC for the portion of Global Settlement associated with UBS's breaches its representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those same breaches.

## COUNT ONE
## (BREACH OF CONTRACT)

81.     RFC realleges each and every allegation set forth in Paragraphs 1 through 80 above as if fully rewritten herein.

82.     RFC and Defendant UBS entered into a valid and enforceable Agreement pursuant to which RFC acquired over 2,200 mortgage loans from UBS.

83.     Pursuant to the parties' Agreement, UBS made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

84.     RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

85.    Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

86.    RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC that stemmed in part from the defective loans sold to RFC by Defendant, and fees and costs incurred in prosecuting this action.

87.    Accordingly, RFC is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

**COUNT TWO**
**(INDEMNIFICATION)**

88.    RFC realleges each and every allegation set forth in Paragraphs 1 through 87 above as if fully rewritten herein.

89.    RFC has incurred substantial liabilities, losses, and damages arising from and relating to material defects in the mortgage loans UBS sold to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC that stemmed in part from the defective loans sold to RFC by UBS.

90.    Defendant expressly agreed to indemnify RFC for the liabilities, losses, and damages, including attorneys' fees and costs, which RFC has incurred as described herein.

91.    Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)     On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)     On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify RFC against liabilities, losses, expenses, and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for damages sufficient to reimburse RFC's liabilities, losses, costs, and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(C)     Any and all such further relief that the Court deems necessary or proper.

Dated:  July 24, 2014

By: _____

     Peter E. Calamari
     Isaac Nesser
     Alex Rossmiller
     John Sullivan
     Nicholas Smith
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
     51 Madison Avenue, 22nd Floor
     New York, New York  10010
     Telephone:  (212) 849-7000
     Facsimile:  (212) 849-7100
     PeterCalamari@quinnemanuel.com
     IsaacNesser@quinnemanuel.com
     AlexRossmiller@quinnemanuel.com
     JohnSullivan@quinnemanuel.com
     NicholasSmith@quinnemanuel.com

     COUNSEL TO RESIDENTIAL FUNDING COMPANY, LLC